HANSON BRIDGETT LLP
ANDREW G. GIACOMINI, CA SBN 154377
agiacomini@hansonbridgett.com
PATRICK T. BURNS, CA SBN 300219
pburns@hansonbridgett.com
ALENE M. TABER, CA SBN 218554
ataber@hansonbridgett.com
BIANCA A. VELEZ, CA SBN 339795
Bvelez@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366

Attorneys for Plaintiffs
DOES 1-100, Individual Persons

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| DOES 1 -100, Individual Persons,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL PARK SERVICE, a federal agency,<br><br>Defendant. | Case No. 3:24-cv-09009<br><br>**COMPLAINT FOR:**<br><br>1.    **FIFTH AMENDMENT**<br>2.    **FAIR HOUSING ACT**<br>3.    **DECLARATORY JUDGMENT ACT**<br>4.    **NATIONAL ENVIRONMENTAL POLICY ACT**<br>5.    **ALL WRITS ACT** |

**INTRODUCTION**

1.      Beef cattle and dairy operations at Point Reyes have a long and rich history dating back to the 1830s.  When Point Reyes was established as a National Seashore, multi-generational ranching became a legislatively authorized use. It still is to this day.

2.      In response to the then Secretary of Interior Salazar's directive that the National Park Service pursue extending permits for the ranchers to 20-year terms, the National Park Service began a planning process to allow for the ongoing practice of permitting commercial dairy and cattle ranching in the National Seashore. Three environmental groups, Resource Renewal Institute, Center for Biological Diversity and Western Watersheds Project, sued the National Park Service in 2016 objecting to the issuance of these permits. The parties settled their lawsuit with the National Park Service agreeing to issue an amendment to the 1980 General Management Plan ("GMPA") that addressed and analyzed the environmental impacts of continuing to allow livestock grazing at the Seashore. The National Park Service agreed to consider and evaluate the following alternatives: a no ranching alternative, no dairy ranching alternative, and a reduced ranching alternative. There was no requirement that the National Park Service exercise its discretion in a particular way or select a non-ranching preferred alternative.

3.      After ten years of studies and analysis and a robust public process that considered over 8,000 public comments, the National Park Service decided to issue 20-year leases to ranchers at the Point Reyes National Seashore. This was welcome news to the people who work and live on these ranches. Their jobs and housing were safe and secure.

4.      Even though the three environmental groups agreed to this process, they nevertheless again sued the National Park Service, this time over the resulting decision (the "Environmentalists' Lawsuit"). The environmental groups are seeking a permanent injunction prohibiting the National Park Service from approving 20-years leases with the ranches, which will result in the discriminatory practice of evicting Hispanic agricultural workers and their families ("Agricultural Workers" also referred to as Does 1-100) from their homes without due process.

5.      For almost three years the Environmentalists' Lawsuit has never progressed. Rather, it was used as a vehicle to shield from the public the environmental groups and National Park

1

Service's secret negotiations to reverse the decision that emerged from the lengthy public process of allowing multi-generational ranching to continue – something that would not have been legally permitted absent the litigation. It is inconceivable that the result of the public process can be overturned by a few special interests. But that is what is occurring. And the National Park Service intends to ram this decision through its internal approval process without public participation or a revised Environmental Impact Statement ("EIS"). Absent this litigation, there would be no public process at all.

6.      The ranchers intervened in the Environmentalists' Lawsuit to protect their interests. But they are prevented from disclosing any information to the public because to participate they had to sign non-disclosure agreements. This lack of transparency, secret negotiating, and imposition of a gag order on matters of public importance is contrary to the public interest.

7.      The people that work and live on the ranches, the Agricultural Workers, who are at risk of becoming unhoused and joining the tens of thousands of people living on the streets, tried to intervene in the Environmentalists' Lawsuit like the ranchers did. But, unlike the ranchers, their attempts were met with considerable opposition from the environmental groups and National Park Service. As such, the Agricultural Workers were left with no option but to file their own lawsuit to ensure their interests are protected.

## JURISDICTION

8.      This Court has subject matter jurisdiction under Article III, § 2 of the U.S. Constitution and 28 U.S.C. § 1331 because this Complaint arises out of the Fifth Amendment of the U.S. Constitution, and the laws of the United States including the Fair Housing Act (Title VIII of the Civil Rights Act of 1968) 42 U.S.C. §§ 3601 et seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq., the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq., and the All Writs Act, 28 U.S.C. § 1651.

9.      An actual, justiciable controversy now exists between Agricultural Workers and Defendant. Agricultural Workers are informed and believe that the National Park Service has made a final decision to enter into agreements with the environmental groups, Resource Renewal Institute,

Center for Biological Diversity and Western Watersheds Project, and Intervener-Defendants, the Point Reyes Seashore Ranchers Association and individual ranchers, to settle the Environmentalists' Lawsuit. The National Park Service's decision has determined the rights or obligations of the parties to the Environmentalists' Lawsuit, but not the Agricultural Workers' rights. Agricultural Workers are informed and believe that the settlements result in the ranches ceasing to operate and vacating all of the structures, including the Agricultural Workers' homes. Agricultural Workers are informed and believe that the National Park Service's decision is sufficiently concrete so that legal consequences that will flow are particularized. Specifically, the Agricultural Workers are informed and believe that they will be evicted from their homes without due process. The Agricultural Workers are, therefore, opposed to any settlement agreement that requires their homes be vacated. The imposition of the gag order on the settlement negotiations deprives the affected Agricultural Workers from obtaining information directly from the parties to that lawsuit. As such, Agricultural Workers rely upon newspaper reports and information received from others.

10.    The federal government waived sovereign immunity pursuant to 5 U.S.C. § 702, 42 U.S.C. § 3613, and 28 U.S.C. § 1343.

11.    Agricultural Workers are not required to have exhausted any administrative remedies because the settlement agreement has not been the subject of any administrative hearing process. Rather, it has been negotiated in secret without Agricultural Workers' participation. The National Park Service has indicated that the agreement will not be part of an administrative hearing process in the future. In fact, the National Park Service's failure to provide an administrative hearing process forms the basis for a number of the causes of action.

**VENUE**

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and the affected public lands and resources are located in this judicial district.

13.    This case concerns substantially the same property and event in the Environmentalists' Lawsuit, Case No. 3:22-cv-145-MMC, pending before the Honorable Maxine M. Chesney in the San Francisco Division, and it would appear likely that there will be an unduly

1  burdensome duplication of labor and expense or conflicting results if the cases are conducted before

2  different Judges. As such, this civil action should be assigned to the San Francisco Division.

3                                              **PARTIES**

4         14.    Plaintiffs, DOES 1 - 34 are individual persons that live in homes on ranches located

5  in the Point Reyes National Seashore in West Marin County, California and some are also employed

6  on the ranches.

7         15.    Defendant, NATIONAL PARK SERVICE, is an agency of the United States within

8  the U.S. Department of Interior. The National Seashore is managed by the National Park Service.

9         16.    Plaintiffs anticipate that other persons will join this case as plaintiffs after this

10 Complaint is filed and served. These persons will also be agricultural workers and their families that

11 live and work on ranches located in the Point Reyes National Seashore. Those plaintiffs are

12 identified as DOES 35-100.  Plaintiffs will seek leave to amend as these DOES become plaintiffs in

13 this case.

14                                             **STANDING**

15        17.    Agricultural Workers have established for each cause of action that they have: (1) an

16 injury in fact; (2) that is fairly traceable to the challenged action of the defendant; and, (3) that can

17 be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

18 Therefore, Agricultural Workers meet the Article III standing requirements.

19        18.    Agricultural Workers have standing to assert their Fifth Amendment claims because

20 each of them will suffer injury by losing the ability to live in their current housing.  Given the severe

21 shortage of housing the Agricultural Workers can afford in Marin County and the extremely long

22 wait times for public assistance, it is very likely that they will end up unhoused. Such injury is

23 directly traceable to the National Park Service because it  reversed course on the General

24 Management Plan Amendment ("GMPA") – that will result in a loss of housing for the Agricultural

25 Workers. Specifically, Agricultural Workers are informed and believe that the National Park Service

26 decided that the ranches will cease to operate, all ranch worker housing structures will be vacated,

27 and the Agricultural Workers will be evicted.  Agricultural Workers contend the due process they

28 are entitled to consists of the government providing fair notice of its actions, holding a hearing

                                              4                    Case No. 3:22-cv-145-MMC

1  before an impartial tribunal as part of the Writ cause of action, and giving the affected persons the

2  right to be heard and present their case. Agricultural Workers will continue to live on the ranches if

3  permitted to do so by the National Park Service. The National Park Service's decision to proceed in

4  secret causes the Agricultural Workers' liberty and property interests to be invaded by the

5  government without an opportunity to challenge that invasion and prevent their eviction. If its

6  actions are found unconstitutional, the National Park Service would be enjoined from evicting the

7  Agricultural Workers in this manner, which would redress their injuries.

8      19.    Standing under section 812 of the Fair Housing Act (42 U.S.C.A. § 3612) extends to

9  the full limits of U.S. Constitution Article III. *Havens Realty* Corp*. v. Coleman*, 455 U.S. 363 (1982).

10  The Fair Housing Act authorizes "an aggrieved person" to bring a cause of action for enforcement.

11  42 U.S.C. § 3613(a). An aggrieved person is defined to include "any person who (1) claims to have

12  been injured by a discriminatory housing practice; or (2) believes that such person will be injured

13  by a discriminatory housing practice that is about to occur." 42 U.S.C.A. § 3602(i). An aggrieved

14  person is not required to be a U.S. citizen and can be undocumented immigrants. *Espinoza v. Farah*

15  *Mfg. Co., Inc.*, 414 U.S. 86 (Title VIIs prohibition of discrimination against "any individual" means

16  that "aliens are protected from discrimination.").

17      20.    Agricultural Workers have standing to bring a claim under the Fair Housing Act

18  because they are being injured by the National Parks Service's discriminatory housing practice.

19  *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972). Specifically, the National Parks

20  Service's agreement to settle the Environmentalists' Lawsuit by having the ranchers relinquish their

21  leases and close down the ranches, including vacating worker housing will significantly impact

22  Agricultural Workers, who are not able to locate affordable housing in Marin County. This Court's

23  granting of the requested injunction before the settlement is finalized will redress this injury.

24      21.    The Declaratory Judgment Act authorizes federal courts to grant relief in a "case of

25  actual controversy." 28 USC § 2201(a). This statutory phrase refers to the type of "Cases" and

26  "Controversies" that are justiciable under Article III; i.e., cases involving a substantial controversy

27  between parties having adverse interests of sufficient immediacy and reality.

28  / / /

22.     There is an actual dispute relative to the legal rights of the Agricultural Workers and the obligations of the National Park Service. The Agricultural Workers contend that the National Park Service cannot reverse course on the GMPA without providing due process, and complying with the Fair Housing Act and NEPA. The National Park Service contends that it can reverse its decision that is memorialized in the Record of Decision ("ROD") and GMPA, without providing due process and reopening public comment and the EIS. As such, this lawsuit is the only means for the Agricultural Workers to have a say in the negotiations before a final judgment is entered settling the Environmentalists' Lawsuit. Without the relief sought through this lawsuit, the Agricultural Workers face imminent eviction in the near future. A judicial declaration that the National Park Service cannot proceed in this manner, would redress the Agricultural Workers' injuries by protecting their interests and making clear that the National Park Service cannot enter into a settlement of the Environmentalists' Lawsuit that deprives them of their housing.

23.     NEPA challenges proceed under the APA. The APA grants federal court standing to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 USC § 702. When a plaintiff alleges a "procedural injury"—such as the failure to comply with NEPA—the " 'normal standards for ... [the] immediacy' of the injury are relaxed." *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 989 (9th Cir. 2023). Plaintiffs are not required to show that the agency would necessarily have reached a different decision had it complied with NEPA. *Id*. The fact that the National Park Service's decisions must be later memorialized in a final judgment to be entered by the Court does not eliminate the Agricultural Workers' standing because the decisions are a foregone conclusion. *Id*. at 990 ("a contingent 'chain of events' can create a 'reasonably probable' threat to a plaintiff's interests").

24.     Agricultural Workers have standing under the APA to bring a NEPA claim because their interests are intertwined with the environment. Some of their environmental interests include the loss of safe and sanitary housing for low-income households during the California housing crisis, increasing the number of persons that will be exposed to outdoor air and noise pollution, and increasing food insecurity. The unhoused persons utilization of survival tactics, like waste disposal and burning materials for heat, affects both the health of the individual and the environment.

1   Increased homelessness encampments can contribute to trash ending up in waterways, where it can

2   harm aquatic life and increase bacteria levels. There will also be an increased need for California to

3   provide public services to support displaced workers and their families and for public safety when

4   the State is facing a serious budget deficit. The National Park Service is also depriving the

5   Agricultural Workers, and the public, of reviewing and providing input on the National Park

6   Service's decision to not renew the ranchers' leases and to evict the Agricultural Workers, as

7   required by NEPA.

8       25.    Agricultural Workers have standing under the All Writs Act because the National

9   Park Service's failure to comply with NEPA and Executive Order 12898 of February 11, 1994, and

10  implement the GMPA and ROD is resulting in the National Park Service's decision to not renew

11  the ranchers' leases and to evict the Agricultural Workers without due process. These injuries could

12  be redressed by a grant of mandamus relief.

13      26.    Agricultural Workers have prudential standing because as discussed above all of

14  their claims relate to their own legal rights and interests, and are within the zones of interest

15  protected by the Fifth Amendment, Fair Housing Act, Declaratory Judgment Act, NEPA, the APA,

16  and the All Writs Act. A plaintiff can "satisfy NEPA's zone-of-interests requirement even 'if his or

17  her interest is primarily economic, as long as he or she also alleges an environmental interest or

18  economic injuries that are 'causally related to an act within NEPA's embrace.'" *Solar Energy Indus.*

19  *Ass'n*, 80 F.4th at 990–91.

20                  **BACKGROUND**

21                ***Agricultural Workers***

22      27.    Agricultural Workers are of Hispanic origin. Some are undocumented. Agricultural

23  Workers live on the ranches, some for a decade. The Agricultural Workers live on the ranches with

24  the knowledge and acquiescence of the National Park Service.

25      28.    Agricultural Workers' households fall in the extremely low, very low, and low

26  income categories, earning less than 80% of median income.  The rent they pay is just within the

27  limits of affordability for these households. They either pay the rent separately or the rent is

28  subtracted from their paychecks.

21379321.1

*Point Reyes National Seashore*

29.     The Point Reyes National Seashore located in West Marin County was established by President John F. Kennedy on September 13, 1962. Cattle ranching started in the 1830s and the dairy industry in the late 1850s. From the beginning, the enabling legislation (Public Law 87-657) recognized ranching as a permitted use. The National Park Service has a long history of authorizing the issuance of lease/special use permits (lease/permits) for agricultural, ranching, or dairying purposes, and associated housing. Congress has continued to consistently express a desire that ranching activities continue within the National Seashore.

30.     When Congress amended the legislation in 1970 by repealing the prohibition on condemning ranches, the National Park Service was authorized when it acquired the land to continue ranching through retained rights of use and occupancy (as authorized under Section 5 [formerly Section 6] of the National Park Service's enabling legislation), or by using the leasing provisions of the Land and Water Conservation Fund Act. S. Rep. 91-738, at 2, 7–8 (1970); 116 Cong. Rec. S7615 (March 17, 1970).

31.     When the legislation was amended in 1978, language was added to facilitate the National Park Service's ability to authorize ranching. In addition to expanding the types of use and occupancy rights that ranchers could retain, Congress included specific leasing authority allowing agricultural lands to be leased back to prior owners or lessees. Any land to be leased by the Secretary of Interior was to be offered first to the person who owned such land or was a leaseholder thereon immediately before its acquisition by the United States. Act of Nov. 10, 1978, Pub. L. No. 95-625, Title III, § 318(b), 92 Stat. 3467, 3486–87; codified as amended at 16 U.S.C. § 459c-5.

32.     As is evidenced by some of the leases with the ranches, the National Park Service was well aware that employees of the ranches were living on-site.

*Ranch Comprehensive Management Plan*

33.     On November 12, 2012, Congress's long-standing interest in ranching prompted former Secretary of the Interior Salazar to direct the National Park Service to pursue extending permits for the ranchers to 20-year terms. On January 13, 2013, the Director of the National Park Service delegated authority to the Regional Director to enter into leases/permits for the purpose of

grazing cattle and operating beef and dairy ranches, along with associated residential uses by the lessees and their immediate families and their employees, and their employees' immediate families. The long-term leases were intended to provide greater certainty for the ranches and to continue the presence of daily and beef ranching operations at the National Seashore. To the Agricultural Workers' knowledge, these directives remain in place.

34.    In order to carry out the Secretary's direction, in the spring of 2014, the National Park Service initiated the development of a Ranch Comprehensive Management Plan. The National Park Service proclaimed that: "Ranching has a storied history on the Point Reyes peninsula and surrounding lands and is an important part of the fabric of Point Reyes National Seashore." "These working ranches are a vibrant part of Point Reyes National Seashore and represent an important contribution to the superlative natural and cultural resources of these NPS lands. Protection of these diverse and unique resources is an important responsibility shared by the NPS and park ranchers within the agricultural lease/permit areas." The Plan had two objectives: (1) enable the National Park Service to issue 20-year ranch permits; and, (2) devise an effective management strategy for tule elk.

35.    In February 2016, three environmental groups, Resource Renewal Institute, Center for Biological Diversity and Western Watersheds Project, sued the National Park Service claiming that the National Park Service failed to timely revise its 1980 GMP and that it never analyzed the environmental impacts associated with authorizing continued ranching. A GMP is required for the preservation and use of each national park. 54 U.S.C.A. § 100502. Several ranchers and the County of Marin intervened. The environmental groups objected to ongoing practice of permitting commercial dairy and cattle ranching in the National Seashore. The environmental groups and the National Park Service, together with the ranchers and the County of Marin, entered into settlement negotiations in an effort to resolve the litigation. The multi-party Agreement was approved by the U.S. District Court on July 14, 2017. Per the multi- party Agreement, the National Park Service agreed that in lieu of the Ranch Comprehensive Management Plan, it would prepare a GMPA and EIS addressing the management of the lands currently leased for ranching within the Seashore and analyzing the environmental impacts of continuing to allow livestock grazing at the Seashore.  The

1   National Park Service agreed to consider and evaluate the following alternatives: a no ranching

2   alternative, no dairy ranching alternative, and a reduced ranching alternative. There was no

3   requirement that the National Park Service exercise its discretion in a particular manner to select the

4   preferred alternative.

5   *General Management Plan Amendment*

6       36.     In 2019, Congress directly addressed the GMPA planning process in a Joint

7   Explanatory Statement accompanying House Joint Resolution 31 (the Consolidated Appropriations

8   Act, 2019). The Joint Statement noted that "multi-generational ranching and dairying is important

9   both ecologically and economically" and is "fully consistent with Congress's intent for the

10  management of Point Reyes National Seashore." The statement further expressed the conferees'

11  "strong support" for the October 2017, GMPA Initial Proposal, which proposed continued ranching

12  and dairying operations under lease/permits with 20-year terms. H. Rep. 116-9 at 720-21 (2019).

13  The National Park Service's Management Policies 2006 (Section 1.4.3.1) direct park managers to

14  consider Congressional interest, as expressed in enabling legislation, when deciding whether to

15  allow a legislatively authorized use.

16      37.     The formal scoping process for the EIS was initiated on October 31, 2018. Over

17  1,340 pieces of correspondence were received during the 30-day scoping period. In response to the

18  Notice of Availability for the DEIS on August 9, 2019, more than 7,600 pieces of correspondence

19  were received during the comment period. Even after the September 2020 release of the FEIS, the

20  National Park Service continued to receive a number of letters from other agencies and the public

21  regarding a variety of issues addressed in the GMPA. This demonstrates the tremendous public

22  interest in the long-term management of the Point Reyes National Seashore. After considering all

23  of these comments, the National Park Service made its decision, which was reflected in the GMPA

24  and ROD dated September 13, 2021.

25      38.     The National Park Service adopted a modified alternative B from the EIS. Alternative

26  B is set forth in the GMPA.

27      39.     The GMPA addressed the management of approximately 28,000 acres of land leased

28  for ranching. The GMPA adopted a new zoning framework and new programmatic management

1    direction for the planning area by establishing two new management zones, the Ranchland zone and

2    the Scenic Landscape zone. Land in the Ranchland zone has been actively ranched before and after

3    their acquisition by National Park Service.

4          40.    Under the GMPA, multi-generational ranching activities is considered an appropriate

5    use in the Ranchland zone, and continued occupancy and use of lease/permit areas for multi-

6    generational ranching will occur according to the management strategies specified in the ROD.  The

7    EIS alternative that the National Park Service selected authorized it to issue lease/permits with up

8    to 20-year terms to existing families who agree to undertake required actions to continue ranching

9    operations on approximately 25,500 acres. The National Park Service decided that the longer term

10   leases (i.e., 20 years) will allow ranchers to amortize increased investment in the operational

11   infrastructure required to maintain historic structures and meet expectations for implementation of

12   Management Activities, which mitigate potential natural resource impacts. As a condition of the

13   lease/permit, all ranch worker housing was required to be maintained in a safe and sanitary condition

14   to ensure the health and well-being of occupants. The National Park Service also determined that in

15   some cases, conversion of permanent pasture to seasonal grazing regimes in coordination with

16   ranchers may achieve desired conditions for grassland habitat and fire protection while also reducing

17   potential water quality impacts. This is what the public and the Agricultural Workers had every

18   reason to believe would occur, and this is the only action that could legally proceed under the ROD.

19         41.    The National Park Service's decision to continue permitting ranching is expressly

20   permitted by law, which provides that the "Secretary, under such regulations and on such terms as

21   the Secretary may prescribe, may grant the privilege to graze livestock within a System unit when,

22   in the Secretary's judgment, the use is not detrimental to the primary purpose for which the System

23   unit was created." 54 U.S.C.A. § 102101(a)(2). The National Park Service made the requisite non-

24   impairment determination for the selected alternative that continued ranching.

25         42.    The National Park Service determined that the "selected action considers ranching

26   an appropriate use of park lands in the Ranchland zone and manages ranching through a number of

27   new approaches that will support desired conditions for the planning area. Only grazing will be

28   allowed in the Range subzone which comprises more than 60% of the Ranchland zone. As

documented in the EIS and USFWS [U.S. Fish and Wildlife Service] Biological Opinion, grazing is not only compatible with the resource conditions in this zone, it also helps support populations of some federally-listed plant species." ROD, p. 47.

43.     According to "the EIS analysis, NPS has determined that a continued grazing regime within the grasslands (representing approximately 60% of the planning area and over half of the Range subzone and 86% of the Pasture subzone) is important to maintain many natural and cultural resources including rare plants, native and naturalized grasslands, and the historic cultural landscape. In their 2021 Biological Opinion, USFWS concluded that "the general changes to ranching in Point Reyes National Seashore and the north district of Golden Gate National Recreation Area will not have noticeable negative effects on the populations (California red-legged frog, western snowy plover, Myrtle's silverspot butterfly, beach layia, Sonoma alopecurus and Sonoma spineflower) and in some cases may actually improve conditions. This is supported by the general positive trends since the 2002 biological opinion on Ranching Activities in Point Reyes (USFWS 2002) was issued." Grazing is also necessary to prevent further encroachment by shrubland and forest habitat, which are abundant elsewhere in the park outside of the planning area. Protecting the park's grasslands is consistent with the Seashore's legislative history which cited the large expanses of pastureland and their contribution to the scenic beauty of the area as a factor supporting the establishment of Point Reyes as a unit of the national park system." ROD, p. 47.

44.     GMPs are required to articulate measures for the preservation of an area's resources. Accordingly, the Biological Assessment for the GPA prepared by the U.S. Fish and Wildlife Service identifies management strategies for the preservation of the area resources.  These include targeted grazing to maintain rare and endangered habitat and species.

45.     The National Park Service developed a template of the ranch leases that would greatly benefit Agricultural Workers. Among other things, the leases would have:

A.     provided housing security for at least twenty years;

B.     expressly recognized that housing on the ranches would be rented or otherwise offered to ranch workers (together with their families) who are employed on a ranch within Point Reyes National Seashore;

C.      ensured that worker housing is safe, sanitary, and decent and that the physical condition of such housing complies with all applicable laws, including building codes, and that the exterior areas around the housing units would remain clean and slightly;

D.      provided for ranch workers to have housing rental agreements with the ranchers that would comply with applicable laws, including landlord-tenant laws;

E.      provided that any rents charged for the housing would not exceed rental rates identified in the appraisal for the ranch;

F.      reserved the right of the National Park Service to inspect ranch worker housing and to review ranch worker rental agreements to ensure that housing conditions and rental rates comply with the lease terms;

G.      ensured cyclic maintenance for worker housing;

H.      ensured that all utilities on the ranch (e.g., water, electric, sewer/septic, propane) would be operational at all times;

I.      ensured all fire protection systems including alarms, sprinkler systems and extinguishers would be inspected on an annual basis, and maintained in full operating condition at all times; and,

J.      provided that at all times during the term of the lease that the ranchers would maintain in full force and effect Workers' Compensation and Employer's Liability Insurance.

46.     The National Park Service acknowledged in the ROD that multi-generational ranching is a legislatively authorized use for lands in Point Reyes and that "the legislative record reflects decades of Congressional support for beef and dairy ranching on lands in the planning area, as well as a recognition of the linkage between ranching and maintenance of the park's scenic and pastoral qualities. This history together with the recent reaffirmation of Congressional support for ranching confirm that ranching remains an appropriate use of park lands today. In accordance with NPS [National Park Service] Management Policies Section 1.4.3.1, the NPS has determined that ranching may continue provided that it does not cause impairment or unacceptable impacts to park resources."

/ / /

*Environmental Groups Litigation Against the National Park Service*

47.     Even though the environmental groups had agreed to this process, on January 10, 2022, they filed the Environmentalists' Lawsuit in federal court challenging the National Park Service's approval of the GMPA. They alleged that allowing ranching to continue would cause water pollution, and impact fish and the tule elk, among other claims. Their intention is to shut down all ranching and prevent new ranches from being established.

48.     The 2017 multi-party Agreement did not preclude the National Park Service from selecting a GMPA alternative that allowed long term leases with the ranchers. The environmental groups do not contend that the National Park Service breached the 2017 multi-party Agreement. Rather, the environmental groups simply do not like the result. They want to control the content of the GMPA and ROD.

49.     Several ranchers and the Point Reyes Seashore Ranchers Association intervened to protect their rights. The ranchers hold interim and long term, multi-generational leasehold interests, Rights of Use and Occupancy ("RUO's").

50.     Agricultural Workers have an interest in those leasehold rights as they have long rented and occupied housing, including as a part of their employment arrangement with the ranchers. They have an actual current and ongoing lawful possessory interest. If the ranchers' leasehold interests are terminated as a result of the Environmentalists' Lawsuit , Agricultural Workers will lose not only their jobs, but also their housing.

51.     Recent news coverage and letters to the Court shows that the public interest in this matter has not waned. According to newspaper reports, the parties have been engaging in a secret negotiation process to reject the decisions made in the GMPA that was developed through a public process.  Reports indicate that the National Park Service is on the cusp of reversing course on allowing multi-general ranching contrary to Congress' clear intent that ranching remain. Agricultural Workers are informed and believe that under the terms of the settlement, the National Conservancy will buy out the ranch leases and the ranchers will relinquish their leases and close down the ranches, including vacating worker housing. The ranches and worker housing will be converted to public use.

52.     Agricultural Workers are informed and believe that the settlement agreement is being based in part on alternative operating scenarios that the National Park Service rejected. These alternatives were rejected because, for example, the grazing benefits that support grassland habitat features and associated wildlife habitat would be lost, the integrity of the Point Reyes Peninsula Dairy Ranches Historic District would be diminished, and an increase in fuel loading and thereby fire risk. Agricultural Workers are informed and believe that the National Park Service is leaning on these rejected alternatives precisely for the purpose of avoiding reopening the EIS, analyzing the impacts of eliminating agricultural worker housing, and allowing for public input.

53.     Secretly negotiating public policy is directly contrary to the requirements of transparency in government decision-making. By cloaking the public decision-making process within the confines of "confidential mediation," the National Park Service has thwarted the public's right to know. Transparency is the foundation of democracy allowing citizens to scrutinize government actions and hold officials accountable. There is no public interest represented at the table, let alone Agricultural Workers that will be directly affected by the settlement under consideration.

54.     Agricultural Workers are informed and believe that the National Park Service has no intention of allowing anyone other than the parties to participate in its decision-making. Any agreement will only be reviewed and approved by the parties. As such, this lawsuit may provide the only mechanism for the Agricultural Workers to challenge the National Park Service's settlement terms before they are implemented.

55.     The Agricultural Workers and the public are entitled to know the people's business and provide input before a judgment is entered.  The secret negotiations and imposition of a gag order make this impossible.  The National Park Service should disclose to the public the substance of the negotiations, lift the gag order, hold public workshops, provide a formal comment period, produce a revised EIS, and issue another ROD before a judgment is entered in the Environmentalists' Lawsuit.

56.     None of the current parties to the Environmentalists' Lawsuit represent the interests and legal rights of the Agricultural Workers. Agricultural Workers' attempts to intervene were met

with considerable opposition from the environmental groups and National Park Service. The Agricultural Workers are not parties to the Environmentalists' Lawsuit , and their legal rights and remedies will not be decided in that proceeding. As such, the Agricultural Workers were left with no option but to file their own lawsuit to ensure their interests are protected.

57.    The ROD and EIS remain valid under the law.

*California's Housing Crisis*

58.    California is at the epicenter of the nation's housing crisis. The high cost of housing is particularly devasting for people with the lowest incomes. There are enough subsidized housing vouchers to meet the needs of all eligible households. The burdens of housing insecurity hits minorities the hardest.

59.    Pursuant to the 1948 Universal Declaration of Human Rights, there is a human right to adequate housing. Shelter is necessary for human existence. The right to adequate housing includes security of tenure, equal and non-discriminatory access to adequate housing, affordability, and participation in housing-related decision-making.

60.    Most recently, on November 23, 2024, California Governor Gavin Newsom, signed a legislative package to strengthen California's laws addressing the housing and homelessness crisis. The legislation mandated that locals plan for housing for extremely vulnerable residents and increase accountability.  So, while California is attempting to address the housing shortage, the National Park Service is planning on evicting the Agricultural Workers and adding to the homelessness problem in this State.

61.    The Agricultural Workers have been searching for affordable housing, but have not been able to find a place to live. This is because there is a severe lack of affordable housing in West Marin County, and a backlog of persons needing assistance finding interim housing, rental assistance, and permanent housing. Because there are insufficient County services to address the current housing shortage, Agricultural Workers and their families are at risk of becoming unhoused if the environmental groups and National Park Service settle their lawsuit as reported. The Agricultural Workers would be seriously affected if they are required to relocate to secure affordable housing. For example, they would leave behind familiar surrounds and support systems, experience

21379321.1

isolation, and suffer from multiple stresses that affect mental well-being. Children may struggle to adapt to a new school system potentially impacting their academic performance.

### FIRST CAUSE OF ACTION

#### Fifth Amendment – Procedural Due Process/Equal Protection

62.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

63.    The Fifth Amendment to the U.S. Constitution provides that no person shall be deprived of life, liberty, or property, without due process of law. Fair play is the essence of "due process."

64.    Agricultural Workers belong to a recognized minority group.

65.    Agricultural Workers have a liberty interest in their existing housing. The U.S. Supreme Court has recognized that the right to establish a home is part of the liberty guaranteed by the due process clause of the Fourteenth Amendment. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)(the liberties protected by the due process clause include the right to establish a home). *Griswold v. Connecticut*, 381 U.S. 479, 484 (1965) (the Fifth Amendment provides protection against all governmental invasions "of the sanctity of a man's home and the privacies of life.").  The federal government cannot unduly interfere with a person's ability to obtain and maintain housing.

66.    Agricultural Workers also have a legitimate claim of entitlement to their homes. The National Park Service knows that they live on the ranches and acquiesced to their physical possession for years. The protections of the due process clause extend to any significant property interest. *Fuentes v. Shevin*, 407 U.S. 67 (1972). Property interests protected by the Fifth Amendment include possessory interests. *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 760 (4th Cir. 1990). Agricultural Workers' possessory property interests are established by the federal Fair Housing Act (42 U.S.C. §§ 3601 et seq.) that prohibits discriminatory disparate impacts, the California Fair Employment and Housing Act (Gov. Code, §§ 12955 et seq.) that protects tenants from discrimination, and the California Tenant Protection Act (Civil Code, § 1946.2) that requires "just cause" to evict tenants. By closing down the ranches, the National Park Service is evicting the Agricultural Workers. Tenants cannot be evicted without due process. *Richmond Tenants Org., Inc.*

*v. Kemp*, 956 F.2d 1300 (4th Cir. 1992). Further, as long as there was some dispute as to the right of continued possession, a possessor is entitled to due process. *Dunbar Corp.*, 905 F.2d at 760.

67.     Agricultural Workers' liberty and property interests detailed above have been invaded by the National Park Service without due process. The National Park Service did not provide sufficient due process, such as disclosing to the public the substance of the negotiations, lifting the gag order, holding public workshops, providing a formal comment period, producing a revised EIS, and issuing another ROD before a judgment is entered in the environmentalists' lawsuit.

68.     The National Park Service's purported justification for the invasion, to settle a lawsuit with terms that are contrary to result from the public process, is not compelling or rationally related to a legitimate government interest, goal, objective or purpose.

69.     The procedures the National Park Service intends to follow to settle the Environmentalists' Lawsuit are constitutionally inadequate to evict the Agricultural Workers from their homes. The entire purpose of the ROD was to decide whether multi-generational ranching would continue. The ROD informed the public and Agricultural Workers that the National Park Service would allow the ranches to operate for at least another twenty years. There has been no public process that would permit the National Park Service to reverse course on its decisions articled in the ROD. Rather, the negotiations are being conducted in secret. The Agricultural Workers' are informed and believe that the  National Park Service does not intend to provide any due process to the Agricultural Workers before agreeing with the environmental groups' demands to cease ranching and vacate all structures at the National Seashore.

70.     Because the National Park Service's action will deprive the Agricultural Workers of their property interests and the basic human right to housing, at a minimum the Agricultural Workers are entitled to pre-deprivation due process consisting of the government providing fair notice of its actions, holding a hearing before an impartial tribunal, and giving the affected persons the right to be heard and present their case. Specifically, the National Park Service should disclose to the public the substance of the negotiations, lift the gag order, hold public workshops, provide a formal comment period, produce a revised EIS, and issue another ROD before a judgment is entered in the

1    environmentalists' lawsuit.

2    71.    The Fifth Amendment also prohibits denying to any person the equal protection of

3    the law. *United States v. Windsor*, 570 U.S. 744, 774 (2013). In other words, all persons similarly

4    situated should be treated alike. The U.S. Supreme Court's "decisions have established that

5    classifications based on alienage, like those based on nationality or race, are inherently suspect and

6    subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular'

7    minority." *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971)(footnotes omitted).

8    72.    The ranchers and the Agricultural Workers are both losing their livelihood and homes

9    as a direct result of the National Park Service's decisions. Despite the fact that they are similarly

10   situated, the National Park Service is intentionally treating the Agricultural Workers differently from

11   the ranchers and doing so without a rational basis or compelling reason. The National Park Service

12   has opposed Agricultural Workers request to intervene in its case with the environmental groups so

13   that they can protect their interests, but did not oppose the ranchers similar request. The National

14   Park Service has excluded the Agricultural Workers from the negotiations that will affect their

15   livelihoods and housing, while the ranchers are allowed to represent their interests. Agricultural

16   Workers are informed and believe that the National Park Service is facilitating a compensation plan

17   for the ranchers, but not the Agricultural Workers. This is a race based classification that qualifies

18   as discriminatory conduct, which is injurious and not justified.

19   **SECOND CAUSE OF ACTION**

20   **Fair Housing Act (Title VIII of the Civil Rights Act of 1968)**
     **42 U.S.C. §§ 3601 et seq.**

21

22   73.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

23   74.    The National Park Service is the landlord. The Agricultural Workers are sublessees.

24   75.    The Fair Housing Act (Title VIII of the Civil Rights Act of 1968), 42 U.S.C.A. §§

25   3601 et seq., is the federal statute that protects homebuyers and renters from discrimination on the

26   basis of race, color, religion, sex, national origin, familial status, and disability.

27   76.    "A disparate impact analysis examines a facially-neutral policy or practice ... for its

28   differential impact or effect on a particular group." *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp.

2d 133, 142 (E.D.N.Y. 2011). A party may establish a disparate impact by showing that the challenged action had the effect of discriminating on the basis of race or one of the other criteria barred by the Act. *Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District*, 17 F.4th 950 (9th Cir. 2021). *Id*. A party is not required to show that the party responsible for those policies or practices had intended to discriminate on such grounds. 42 U.S.C. § 3604.

77.    The National Park Service's decision to treat similarly situated lessees differently causes a significantly adverse or disproportionate impact on a protected group of individuals. Agricultural Workers are informed and believe that the ranchers will be compensated so that they can locate comparable housing. The National Park Service has not offered any compensation or affordable housing options for the Agricultural Workers. There is a serious shortage of affordable housing and extremely long waiting lists for public assistance in West Marin County. Because the Hispanic Agricultural Workers have an overall proportionally greater need for affordable housing than the ranchers, the National Park Service's decision deprives Hispanics of affordable housing with a disproportionate impact.

78.    The National Park Service's decision is not bona fide and legitimate. To appease the environmental groups, Agricultural Workers are informed and believe that the National Park Service is discarding a decade of studies and analysis demonstrating that the continuation of the multi-generational ranching is preferred; a decision that was also the outcome of an open, legitimate public process.  Further, the National Park Service is making concessions relative to the environmental groups' NEPA claims based in part on guidelines issued by the Council on Environmental Quality ("CEQ") that were invalidated on November 12, 2024, by District of Columbia Circuit Court of Appeals in the case of *Marin Audubon Society v. Fed. Aviation Administration*.

79.    There are less discriminatory alternatives that can achieve the National Park Service's objectives of eliminating ranching at the National Seashore, such as adaptive reuse of the existing housing on the ranches that would allow the Agriculture Workers to remain permanently at affordable rent levels, or replenishment housing. In fact, the EIS recognizes the benefits of adaptive reuse of the existing structures.

/ / /

80.    The Fair Housing Act provides that a permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate) may be granted as relief. 42 U.S.C.A. § 3613(c)(1).

**THIRD CAUSE OF ACTION**

**Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq.**

81.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

82.    Under the Declaratory Judgment Act, in a case of actual controversy in its jurisdiction, a court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree. 28 U.S.C. § 2201(a).

83.    An actual controversy exists as to whether the National Park Service has violated the Agricultural Worker's Fifth Amendment rights and violated the Fair Housing Act and NEPA, all of which provide for a private right of action, the due process that is owed the Agricultural Workers, and the Agricultural Workers' rights to compensation and protectable interests. The parties dispute is definite and concrete, touches upon the legal relations of parties having adverse legal interests, and is real and substantial.

84.    There is a substantial likelihood that the Agricultural Workers will suffer injuries as a result of the National Park Service's decisions. The Agricultural Workers will lose their homes and could become unhoused.

85.    There is a need for the Court to declare the National Park Service's duties under the Fifth Amendment, Fair Housing Act and NEPA, and the Agricultural Worker's rights under these laws.

86.    It is in the public's interest for the National Park Service to treat all persons equally regardless of national origin, and to comply with the law.

87.    The Court may order further necessary or proper relief based on a declaratory judgment or decree may be granted against any adverse party whose rights have been determined by such judgment. 28 U.S.C. § 2202.

21379321.1

**FOURTH CAUSE OF ACTION**

**National Environmental Policy Act 42 U.S.C. §§ 4321 et seq.**

**Under the Administrative Procedures Act, 5 U.S.C. §§ 551 et seq.**

88.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

89.    NEPA expressly requires that a federal agency, like the National Park Service, engage the public before it makes a decision and that engagement is required "to inform the public of an agency's proposed action, allow for meaningful engagement during the NEPA process, and ensure decision makers are informed by the views of the public." 42 U.S.C. § 4332. The National Park Service asserts that it is not required to solicit input on the settlement agreement.

90.    The National Park Service cannot under the guise of settlement arrive at a decision in the absence of NEPA review and that circumvents its consideration of public input. The purpose of NEPA is to inform decision-making; it is not an ad hoc rationalization of a decision already made. NEPA certainly does not sanction the secret process that the National Park Service is utilizing.

91.    NEPA imposes procedural requirements designed to force agencies to take a "hard look" at environmental consequences. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1299 (9th Cir. 2003).

92.    The National Park Service asserts that it is not required to review the environmental impacts, nor prepare any type of assessment, analyzing the impacts of its decisions to not renew the ranchers' leases and evict the Agricultural Workers. This is not a correct recitation of the law. None of the alternatives studied in the EIS address impacts associated with the eviction of the Agricultural Workers or the cumulative impacts caused by the combination of the elimination of both ranching and Agricultural Worker housing.

93.    The National Park Service has failed to take the requisite "hard look" at the environmental consequences caused by its decisions, specifically:

A.    Loss of safe and sanitary housing for low income households within the context of California's housing crisis.

B.    Loss of long term housing security and displacement.

C.    Increased number of unhoused individuals and households that will be exposed to

more: outdoor air pollution that leads to higher incidence of cardiovascular and respiratory mortality rates; noise pollution; interactions with police; crime and violence; criminalization by anti-camping ordinances; food insecurity; difficulties with evacuations during emergencies; extreme heat and cold temperatures; and infectious diseases. The unhoused persons lack access to clean water and sanitary services. Their utilization of survival tactics, like waste disposal and burning materials for heat, affects both the health of the individual and the environment. They are also separated from community identity.

D.      Increased homelessness encampments that can contribute to trash ending up in waterways, where it can harm aquatic life and increase bacteria levels.

E.      Increased need for California to provide public services to support displaced workers and their families and for public safety when the State is facing a serious budget deficit.

The National Park Service's failure to analyze and disclose these impacts violates NEPA.

94.     An EIS should include a reasonably complete discussion of possible mitigation measures, and its omission undermines NEPA's "action-forcing" function. While adaptive reuse of structures in the ranch complexes is specifically recognized in the FEIS as a strategy for maintaining structures and historical preservation, it should be implemented as a mitigation measure to provide affordable housing for the Agricultural Workers. This mitigation measure would have long-term, beneficial effects for the community. The Secretary is authorized to enter into leases for buildings and associated property. 54 U.S.C. § 102102.

95.     NEPA also " requires agencies to prepare a detailed EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The threshold for NEPA analysis "is relatively low: 'It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment.'" *Earth Island Inst.*, 351 F.3d at 1299.

96.     The National Park Service's decision to cease multi-generational ranching and evict the Agricultural Workers from their housing constitutes a major Federal action significantly affecting the quality of the human environment for which an EIS is required, but has not been prepared.

97.    The National Park Service is also failing to comply with Executive Order 12898 of February 11, 1994. Under this Order federal agencies are required to consider alternatives that will avoid or minimize "disproportionately high and adverse" impacts on low-income communities or communities of color. There has been no environmental justice analysis of National Park Service's decision to eliminate housing.

98.    The Executive Order also requires a federal agency to "conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of excluding persons (including populations) from participation in, denying persons (including populations) the benefits of, or subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin." But, this is exactly what the National Park Service  proposes by preventing the Agricultural Workers from participating in the litigation to protect their interests. Participation as mere observers at mediation with no rights or party status, as suggested by the National Park Service , is just another way of sidelining minority and low-income populations.

99.    A court may set aside a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", contrary to a constitutional right, in excess of its statutory jurisdiction, authority, or limitations, or short of statutory right, or "without observance of procedure required by law." 5 U.S.C. § 706(2). Among other things, the National Park Service's decision to evict the Agricultural Workers is not the result of an extensive analysis of various alternatives. There is no explanation of how National Park Service reached its decisions.

100.    When an agency violates NEPA, the presumptive remedy is vacatur of the deficient action. *Solar Energy Indus. Ass'n*, 80 F.4th at 997. Vacatur of the National Park Service's decisions is appropriate because under the Ninth Circuit's test, the seriousness of the agency's errors out weigh the disruptive consequences of an interim change that may itself be changed. The National Park Service will not seek public review and input, and it has ignored serious environmental impacts caused by its decisions. If the National Park Service's decision is allowed to remain in place while it complies with NEPA, the Agricultural Workers will lose their homes, which would make any

1  injunctive or declaratory relief meaningless.

2  **FIFTH CAUSE OF ACTION**

3  **Writ of Mandate/Mandamus (All Writs Act), 28 U.S.C. § 1651**

4  101.    Plaintiffs incorporate by reference all previous allegations as if set forth in full.

5  102.    Mandamus will lie to compel an administrative agency to perform a mandatory,

6  ministerial duty or non-discriminatory act, to take action upon a matter, or exceeded its authority,

7  to follow the applicable requirements of agency regulations, or to act in the public interest. 28 U.S.C.

8  § 1651. *City of Rochester v. U.S. Env't Prot. Agency*, 496 F. Supp. 751, 765 (D. Minn. 1980)

9  103.    The National Park Service has a mandatory, ministerial duty under NEPA to engage

10  the public before it makes a decision, take a "hard look" at environmental consequences of its

11  decisions, consider possible mitigation measures, and comply with Executive Order 12898 of

12  February 11, 1994.  The National Park Service has not complied with any of these requirements

13  relative to its decisions to cease multi-generational ranching and evict the Agricultural Workers

14  from their homes. In the absence of compliance with these requirements, the National Park Service

15  lacks legal authority to implement decisions that are contrary to alternative B as expressed in the

16  ROD, and is not acting in the public interest.

17  104.    The National Park Service is required to provide the Agricultural Workers with due

18  process that consists of providing fair notice of its actions, holding a hearing before an impartial

19  tribunal as part of the Writ cause of action, and giving the affected persons the right to be heard and

20  present their case.

21  105.    There is no adequate alternative remedy to mandamus relief to require the National

22  Park Service to comply with the law.

23  **PRAYER**

24  WHEREFORE, Agricultural Workers respectfully prays for relief as follows:

25  1.    A declaration that the National Park Service: has discriminated against the

26  Agricultural Workers and violated their Fifth Amendment rights to due process and equal protection

27  of the law, the Fair Housing Act, and NEPA; has a legal obligation and duty to provide due process

28  before evicting the Agricultural Workers; and, is required to provide the same opportunities,

benefits, and a comparable level of non-monetary compensation to the Agricultural Workers for housing as it is doing for the ranchers.

      2.      Preliminary and permanent injunctive relief prohibiting the National Park Service from: (1) settling the Environmentalists' Lawsuit, Case No. 3:22-cv-145-MMC, by agreeing not to extend the ranchers' leases for twenty years and not to allow the Agricultural Workers to remain in their homes for the same duration; (2) implementing a GMPA that is not the same one identified as alternative B in the ROD; and, (3) evicting the Agricultural Workers from their homes located in the National Seashore. .

      3.      A writ of mandate ordering the National Park Service to comply with NEPA and Executive Order 12898 before making any decisions that are different from alternative B as stated in the ROD.

      4.      A writ of mandate ordering the National Park Service to permit Agricultural Workers to continue to live in their homes located in the National Seashore.

      5.      For such further and other relief as the Court deems just and proper.

DATED:  December 12, 2024             HANSON BRIDGETT LLP

By: _____
         ANDREW G. GIACOMINI
         PATRICK BURNS
         ALENE M. TABER
         BIANCA A. VELEZ
         Attorneys for Plaintiffs
         DOES 1-100, Individual Persons

21379321.1